**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| UNITED STATE OF AMERICA, **)** | |
| **)** | |
| Plaintiff, **)** | **CRIMINAL ACTION** |
| **)** | |
| v. **)** | No. 13-10193-MLB |
| **)** | |
| JUAN VARGAS, **)** | |
| **)** | |
| Defendant. **)** | |
| **)** | |

**MEMORANDUM AND ORDER**

This case comes before the court on defendant's motion to suppress. (Doc. 13). The motion has been fully briefed (Doc. 15) and the court held an evidentiary hearing on March 3, 2014. Defendant's motion is denied for the reasons herein.

**I.   Facts**

On November 9, 2014, Kansas Highway Patrol Trooper Benjamin Kahle was parked in the median on Interstate 70. Kahle observed a Kia Optima traveling east at 81 miles per hour. The speed limit on I-70 is 75 miles per hour. Kahle drove onto the highway and initiated a traffic stop. Defendant Juan Vargas was the driver of the Optima and he immediately complied by pulling over to the shoulder of the highway. Kahle approached the passenger side of the Optima and asked defendant for his license and insurance. Defendant informed Kahle that the Optima was a rental. Kahle asked defendant where he was going. Defendant said he was heading to New Jersey.

Defendant handed over the paperwork and his hand was shaking. The rental agreement stated that the Optima was rented in California two days earlier. The rental agreement was signed by a third party.

Kahle asked defendant why he did not personally rent the Optima. Defendant stated that he did not have a credit card. The rental agreement was for a period of seven days and the Optima was to be returned to California. At the time of the rental, the Optima had 13,000 miles.

While at the passenger side of the Optima, Kahle observed various items inside. Kahle observed a large black mattress pad, a case of water, personal hygiene items, an empty Red Bull, a Federal Express box with Verizon Wireless paperwork, a bottle of Visine, a black Iphone with directions to New Jersey and a Samsung phone.

Kahle returned to the patrol vehicle and ran a check on defendant's license. Kahle was advised by dispatch that there were no outstanding warrants for defendant's arrest. Defendant, however, did have a history of alien smuggling. Kahle returned to the Optima and gave defendant a warning citation. Kahle handed back defendant's documents and told him to "drive safe." Kahle then turned around and walked back towards his patrol car. When Kahle arrived at the rear of the Optima, he turned and walked back to the passenger window. Kahle asked defendant if he could ask him some more questions. Defendant agreed. Kahle asked defendant about his travel plans. Defendant stated that he would go to New York and New Jersey. Kahle asked defendant who he was visiting there and defendant responded that he did not know anyone in that area. Kahle asked defendant if there were drugs or anything illegal in the vehicle. Defendant said no. Kahle then asked defendant if he could "look real quick." Defendant said sure. Kahle asked "if that's ok" and defendant said yes.

Undersheriff Finley arrived at the scene just before the search

began.[1]  Finley approached the Optima as Kahle asked defendant to step out of the vehicle.  Kahle had defendant walk more than 20 feet in the grass so that he would be safe from oncoming traffic and so that the officers would be safe during the search.  Kahle searched the driver's side and Finley searched the passenger side.  Kahle then opened the trunk with the key.  Kahle observed a bag of shoes, towels and clothes hung on hangers.  Kahle then looked in the spare tire well.  Kahle noticed that the lug nuts did not secure the tire in the well.  The lug nuts were positioned halfway up the screw instead of being flush to the tire.  Kahle also saw that the spare tire's tread was worn down and the rim had tool marks on it.  The spare tire brand was different than the tires on the vehicle and not consistent with what he usually observed in a new rental car.  The tires on the Optima were newer and had a lot of tread.

Finley removed the spare tire from the tire well and bounced it on the ground.  Kahle and Finley heard something shifting inside the tire when it bounced.  Kahle believed that there were drugs inside the tire.  Finley poked a hole in the tire.  Kahle and Finley observed gray duct tape and plastic baggies inside the tire.  They also saw white powder.  The entire search of the Optima lasted only two minutes.  Defendant did not restrict the search area or interrupt the search at any time.  Finley had a drug dog in his patrol vehicle but

---

[1] Kahle did not call Finley for assistance. Finley heard the traffic stop over the radio and drove out to assist. Finley had a drug dog in his patrol vehicle.

-3-

he did not run it around the car until after they cut into the tire.[2]

The tire was not completely taken apart until after Kahle transported defendant to jail. The tire contained five bundles of methamphetamine.

Defendant moves to suppress the search on the basis that it was not consensual or, in the alternative, that it exceeded the scope of defendant's consent. The government contends that the search of the Optima was voluntary and that Kahle had probable cause to search the tire.

**II. Analysis**

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The Supreme Court has liberally interpreted "seizures" to encompass routine traffic stops, "even though the purpose of the stop is limited and the resulting detention quite brief." See Delaware v. Prouse, 440 U.S. 648, 653 (1979). An initial traffic stop is justified at its inception if it was "based on an observed traffic violation," or if "the officer has a reasonable articulable suspicion that a traffic . . . violation has occurred." United States v. Hunnicutt, 135 F.3d 1345, 1348 (10th Cir. 1998).

In this case, the undisputed facts show that the traffic stop was justified. Defendant was traveling at a higher speed than the posted limit in violation of Kansas law. Even when the initial stop is valid, any investigative detention must not last "longer than is

---

[2] Kahle stated that Finley wanted to run the dog for training purposes.

necessary to effectuate the purpose of the stop." Florida v. Royer, 460 U.S. 491, 500 (1983). An officer "conducting a routine traffic stop may request a driver's license and vehicle registration, run a computer check, and issue a citation." United States v. Bradford, 423 F.3d 1149, 1156 (10th Cir. 2005). The uncontroverted testimony shows that Kahle approached the Optima upon initially stopping it and then obtained defendant's driving documents. Kahle returned to his patrol car to write out the warning ticket and run a license check, which was appropriate. Kahle re-approached the Optima, returned defendant's papers and issued the warning. Therefore, the scope of the traffic stop was reasonably related in scope to the circumstances which initially justified the interference. Terry v. Ohio, 392 U.S. 1, 20, 88 S. Ct. 1868 (1968).

After the purpose of the traffic stop is complete, however, "further detention for purposes of questioning unrelated to the initial stop" is generally impermissible. Bradford, 423 F.3d at 1156-57. In general, "lengthening the detention for further questioning beyond that related to the initial stop is permissible in two circumstances. First, the officer may detain the driver for questioning unrelated to the initial stop if he has an objectively reasonable and articulable suspicion illegal activity has occurred or is occurring. Second, further questioning unrelated to the initial stop is permissible if the initial detention has become a consensual encounter." Hunnicutt, 135 F.3d at 1349.

"A detention for a traffic citation can turn into a consensual encounter after the trooper has returned the driver his documentation so long as 'a reasonable person under the circumstances would believe

-5-

he was free to leave or disregard the officer's request for information.'" United States v. Wallace, 429 F.3d 969, 974-75 (10th Cir. 2005) (quoting United States v. Elliott, 107 F.3d 810, 814 (10th Cir. 1997)). "An officer is not required to inform a suspect that he did not have to respond to his questioning or that he was free to leave." United States v. West, 219 F.3d 1171, 1177 (10th Cir. 2000) (citation omitted). A return of documentation "may not end the detention if there is evidence of a coercive show of authority, such as the presence of more than one officer, the display of a weapon, physical touching by the officer, or his use of a commanding tone of voice indicating that compliance might be compelled." United States v. Bustillos-Munoz, 235 F.3d 505, 515 (10th Cir. 2000)(see also United States v. Cardenas-Alatorre, 485 F.3d 1111, 1118 (10th Cir. 2007)).

In this case, Kahle did not display his weapon, used a conversational tone and did not physically touch defendant. Even though Kahle did not explicitly state that defendant was free to leave, the Tenth Circuit has held that "[p]hrases like "thank you" and "have a safe one" signal the end of an encounter. United States v. Ledesma, 447 F.3d 1307, 1315 (10th Cir. 2006). The facts in this case signal a consensual encounter.

Defendant further argues that the two to three second interval in which Kahle quickly returned to the Optima supports the conclusion that defendant still believed he was being detained. The Tenth Circuit rejected an identical claim in United States v. Guerrero, 472 F.3d 784, 789 (10th Cir. 2007), where the defendant claimed "that the detention continued because Deputy Rhodd turned around very shortly after returning the papers and resumed his questioning." Id. The

-6-

fact that Kahle turned around very shortly after returning the papers and resumed his questioning is not coercive.

Based upon the totality of the circumstances in the present case, the court finds that the circumstances would not have caused a reasonable person in defendant's position to believe that he was not free to end the conversation and leave. Next, the court must consider whether defendant freely consented to a search of the Optima.

### Consent to Search

If the person in control of a car voluntarily consents to its search, the officers may search the car without a warrant and not violate the Fourth Amendment. United States v. Taverna, 348 F.3d 873, 878 (10th Cir. 2003). Voluntariness is a question of fact to be determined from the totality of all the circumstances. Schneckloth v. Bustamonte, 412 U.S. 218, 227, 93 S. Ct. 2041 (1973). The government has the burden to prove by a preponderance of the evidence that consent was freely and voluntarily given. United States v. Soto, 988 F.2d 1548, 1557 (10th Cir. 1993).

Under the two-part test for determining whether consent to search was given, the government must: "(1) proffer clear and positive testimony that consent was unequivocal and specific and freely and intelligently given; and (2) prove that this consent was given without implied or express duress or coercion." Taverna, 348 F.3d at 878. The testimony of Kahle and the video of the stop are clear and positive proof that defendant gave unequivocal consent to search. The video confirms that Kahle asked defendant if he had drugs in the car and then asked defendant if he could look inside. Defendant said sure. Defendant voiced no objections or concerns over following

-7-

Kahle's request to look inside or Kahle's instruction for defendant to move 20 feet away from the Optima.

The evidence confirms that defendant's consent was freely and intelligently given. Moreover, there is nothing in the video or from the testimony which would suggest that defendant's consent could be the product of implied or express duress or coercion. There were no threats or promises made, and no coercive means employed. The court finds that defendant's consent to search was freely and voluntarily given and that no show of force or display of weapons was used to obtain this consent.

## Scope of Consent

Defendant next argues that his consent did not include permission to cut into the spare tire. "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness-what would the typical reasonable person have understood by the exchange between the officer and the suspect." United States v. Elliott, 107 F.3d 810, 814 (10th Cir. 1997) (quoting Florida v. Jimeno, 500 U.S. 248, 251, 111 S. Ct. 1801 (1991)). With respect to destruction of property, the Tenth Circuit has held that an officer may not destroy a container unless he has obtained explicit authorization or has another lawful basis upon which to proceed. United States v. Osage, 235 F.3d 518, 522 (10th Cir. 2000). Therefore, Finley's conduct in cutting open the tire exceeded the scope of the search and was not lawful unless the "officers obtained probable cause to search the tire during the portion of the search to which the defendant did consent." United States v. Carbajal-Iriarte, 586 F.3d 795, 802-803 (10th Cir. 2009).

**Probable Cause**

"Probable cause to search a vehicle is established if, under the totality of the circumstances, there is a fair probability that the car contains contraband or evidence." United States v. Edwards, 242 F.3d 928, 939 (10th Cir. 2001)(citing United States v. Nielsen, 9 F.3d 1487, 1489-90 (10th Cir. 1993)). "If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." United States v. Lyons, 510 F.3d 1225, 1241 -1242 (10th Cir. 2007)(citing United States v. Ross, 456 U.S. 798, 825, 102 S. Ct. 2157 (1982)).

The court finds that Kahle and Finley had probable cause to believe that drugs were contained in the spare tire. The spare tire was not properly secured in the tire well at the time of the search. The spare tire was a different brand than the four newer tires on the Optima. The spare tire's tread was worn even though the Optima only had 13,000 miles and Kahle testified that a worn spare tire on a newer rental vehicle was unusual. In addition, the rim had several marks which suggested that it had been worked on. Most importantly, Kahle heard something moving around inside the tire when it was bounced.

Under the totality of the circumstances, the court finds that Kahle had reason to believe that the tire contained contraband.[3] See

---

[3] In addition to the condition of the tire, Kahle identified other reasons to suspect that defendant was transporting drugs: a third party rental agreement, travel plans which contradicted the car rental terms, traveling thousands of miles to visit a location in which defendant did not have any friends or relatives and the existence of two cellular phones. United States v. Santos, 403 F.3d 1120, 1129 (10th Cir. 2005) (implausible travel plans); United States v. Kitchell, 653 F.3d 1206 (10th Cir. 2011)(rental car and

<u>Lyons</u>, 510 F.3d at 1241-42 (probable cause to cut into tire when the rim contained tool marks, the spare tire was a different brand, an "echo test" confirmed that there was something in the tire and the tire was heavy); <u>United States v. Alverez</u>, 235 F.3d 1086, 1089 (8th Cir. 2000)(probable cause to believe tire had contraband when it made a thudding sound); <u>United States v. Strickland</u>, 902 F.2d 937, 943 (11th Cir. 1990)(probable cause to believe the tire contained contraband when the tire's rim was bent, the tire was extremely heavy, and a flopping sound was heard in the tire when it was moved). Therefore, the officers could search the tire by cutting into it.

**III. Conclusion**

Defendant's motion to suppress is accordingly denied. (Doc. 13).

IT IS SO ORDERED.

Dated this __5th__ day of March 2014, at Wichita, Kansas.

s/ Monti Belot<br>
Monti L. Belot<br>
UNITED STATES DISTRICT JUDGE

---

inconsistent travel plans); <u>United States v. Hernandez-Lizardi</u>, No. 11-3236, 530 Fed. Appx 676 (10th Cir. July 23, 2013)(multiple cell phones and inconsistent travel plans).